# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TIMOTHY SHAUN STEMPLE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Case No. 01-CV-166-GKF-PJC** |
| | ) | |
| RANDALL G. WORKMAN,[1] Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Before the Court is Oklahoma death row inmate Timothy Shaun Stemple's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Dkt. # 21). Petitioner, who appears through counsel, challenges his conviction and sentence in Tulsa County District Court Case No. CF-96-5169. Respondent filed a response to the petition denying its allegations (Dkt. # 33), and Petitioner filed a reply (Dkt. # 36). Respondent also filed a supplemental brief (Dkt. # 40). For the reasons discussed below, the Court concludes the petition should be denied.

The Court has reviewed: (1) the petition for writ of habeas corpus, with exhibits, the response to the petition, and the reply to the response; (2) the supplemental brief filed by Respondent; (3) transcripts of the preliminary hearing held on December 30, 1996, motion hearing held on January 2, 1997, motion hearing held on February 3, 1997, motion hearing held on February 28, 1997, scheduling hearing held on June 16, 1997, and motion hearing held on November 21, 1997; (4) transcript of the December 1-16, 1997, jury trial proceedings (twelve volumes), some with attached

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the **Court Clerk** is hereby directed to substitute Randall G. Workman for Gary Gibson as the party Respondent.

trial exhibits; (5) transcript of the sentencing proceedings held February 13, 1998; (6) transcript of indigence proceedings held February 20, 1998; (7) all documents and exhibits admitted in jury trial proceedings, including one video tape exhibit; (8) Original Record (O.R.) in Tulsa County Case No. CF-96-5169, Volumes I, II and III; and (9) all records before the Oklahoma Court of Criminal Appeals and United States Supreme Court which were transmitted to this Court as verified by the parties (Dkt. # 37).

## BACKGROUND

### I.      Factual Background

In the early morning hours of October 24, 1996, Petitioner's wife, Trisha Stemple, was brutally murdered. Her body was left on the side of U.S. Highway 75 in Tulsa County, Oklahoma. Stemple was charged and convicted of the killing of his wife. Pursuant to 28 U.S.C. § 2254(e)(1), the historical facts as found by the state court are presumed correct. In considering the issues presented in the petition, the Court relied upon the following synopsis from the Oklahoma Court of Criminal Appeals ("OCCA") in that court's direct appeal opinion. Following review of the record, trial transcripts, trial exhibits, and other materials submitted by the parties, the Court finds this summary by the OCCA is adequate and accurate. Therefore, the Court adopts the following summary as its own.[2]

> Stemple concocted a plan to terminate the life of his wife, Trisha Stemple, and to collect her life insurance proceeds. Stemple was having an extra-marital affair with Dani Wood. Dani Wood had a sixteen year old cousin, Terry Hunt. According to Hunt, Stemple offered him $25,000 to $50,000 to help kill Trisha (if they collected the insurance money).

---

[2] Additional facts, apparent from the record, may be presented throughout this opinion as they become pertinent to this Court's analysis.

Hunt recruited another person, Nathanial [sic] Helm to assist in the plan. Helm and Hunt went to Wal-Mart where they purchased a baseball bat and plastic wrap. The plastic wrap was wrapped around the bat to keep the bat from getting bloody.

On October 10, 1996, Hunt and Helm went to the designated location on highway 75 and waited for Stemple and his wife to arrive. A while later Stemple drove up and told Helm and Hunt that Trisha was ill and he could not get her to accompany him.

Two weeks later, Stemple arranged for Hunt to drive Stemple's pickup to a particular location on highway 75 and leave the hood up. Stemple and Trisha arrived in their black Nissan Maxima. Stemple began working on the truck and Trisha stood next to the truck. Hunt came up behind Trisha and hit her in the head with the bat. The blow did not render Trisha unconscious, so Stemple took the bat and hit her several more times.

Stemple and Hunt then placed Trisha's head in front of the front tire of the pickup and attempted to run over her head, however, the tire would not roll over Trisha's head so her head was pushed along the pavement. After this, Trisha tried to get up. Stemple grabbed the bat and hit her several more times. The pair then placed Trisha's body under the truck and drove over her chest. After this Trisha rose up on her elbows, so Stemple hit her again several times with the bat.

Stemple then went back to the black Nissan and drilled a hole in the front tire to make it look as if Trisha's car had a flat. One expert testified that the hole in the tire had spiral striations consistent with drilling. Stemple and Hunt left in the pickup, but decided to turn around to make sure Trisha was dead. When they got back to the spot where they left Trisha, they noticed that she had crawled into the grass beside the road. Stemple then sped up and ran over Trisha as she lay in the grass.

Trisha's body was found later that morning, after Stemple called reporting that she was missing. The autopsy evaluation revealed that Trisha had fractures to her arm, ribs, pelvis, vertebrae and skull. The medical examiner concluded that Trisha died from blunt force trauma to the head.

While in the Tulsa County jail awaiting trial, Stemple made numerous notes including confessions, lists of witnesses, etc. Inmates testified that Stemple tried to get them to arrange the death of several witnesses. The inmates also testified that Stemple gave them a copy of his confession. Included in these writings were sample letters for witnesses Terry Hunt and Dani Wood, detailing their involvement and exculpating him from the crime. Hunt and Wood were to be coerced into rewriting and signing the letters by persons hired by the other inmates.

Stemple claimed that he was at home when Trisha left during the middle of the night. Stemple testified that he believed that Wood was responsible for the murder of

3

Trisha.

Stemple v. State, 994 P.2d 61, 65-66 (Okla. Crim. App. 2000).

## II.    Procedural History

Following a jury trial in the District Court of Tulsa County, Oklahoma, Case No. CF-96-5169, Stemple was convicted of Count I, Murder in the First Degree (malice aforethought), Count II, Conspiracy to Commit Murder, and Count III, Attempted Murder. Attorneys Creekmore Wallace and Johnie O'Neal represented Stemple at trial. At the conclusion of the sentencing stage, Stemple's jury found the existence of two aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel; and (2) the murder was committed for remuneration or the promise of remuneration. On February 13, 1998, in accordance with the jury's recommendations, the trial court sentenced Stemple to death on the murder conviction (Count I), to ten (10) years imprisonment on the conspiracy conviction (Count II), and to twenty-two years imprisonment on the attempted murder conviction (Count III). Johnie O'Neal represented Stemple at the sentencing hearing.

Stemple filed a direct appeal of his convictions and sentences to the OCCA in case No. F-98-201. Attorney Gloyd McCoy represented him on appeal. Stemple identified fourteen (14) propositions of error as follows:

Proposition I:      There can be no harmless error in this case.

Proposition II:     Mr. Stemple was denied a fair trial because of the failure of the prosecutors to comply with basic discovery principles and constitutional rules and notify his trial lawyer of a change in the testimony of the State's key witness from the preliminary hearing; Mr. Stemple, at minimum, is entitled to an evidentiary hearing on this issue.

Proposition III:    Mr. Stemple was denied a fair trial because the State admitted into evidence a videotape (State's Exhibit 87) which showed Mr. Stemple's exercise of his right to remain silent and his right to the

4

assistance of counsel; additionally, the prosecutor made numerous improper remarks stressing Mr. Stemple's exercise of his important rights to silence and counsel and his failure to "cooperate" with the police.

Proposition IV:   Mr. Stemple was denied his right to be present during critical parts of his trial when he was not present during a key portion of the voir dire; the resulting prejudice was that Mr. Stemple could not effectively assist his counsel during the important task of jury selection.

Proposition V:   Mr. Stemple was denied his right to effective assistance of counsel during the guilt/innocence stage of his trial.

Proposition VI:   The prosecutor's remarks about "abuse" of children in Oregon denied Mr. Stemple a fair trial.

Proposition VII:   Mr. Stemple was denied a fair trial during the guilt stage because of improper remarks and actions of the prosecutor.

Proposition VIII:   There is insufficient evidence to support the attempted murder charge.

Proposition IX:   The conspiracy conviction and the attempted murder conviction violate state law and the prohibition against double jeopardy.

Proposition X:   The evidence regarding past insurance claims was irrelevant and were[sic] prejudicial; Mr. Stemple is entitled to a new trial due to the improper evidentiary rulings of the trial judge.

Proposition XI:   The "jailhouse papers" introduced into evidence by the State (evidence obtained by the State's jailhouse witnesses) should not have been admitted into evidence; the papers prepared by Mr. Stemple were subject to the protection of the attorney-client privilege and the work product doctrine.

Proposition XII:   Improper remarks by the prosecutor during the sentencing stage denied Mr. Stemple due process and a fair sentencing proceeding.

Proposition XIII:   The aggravating circumstances are not supported by sufficient evidence and are unconstitutional.

Proposition XIV:   The cumulative effect of the numerous errors require that this case be remanded for a new trial or that a new sentencing hearing be held or

that the death penalty should be vacated.

See Dkt. # 37, Brief of Appellant in OCCA Case No. F-98-201.

On January 20, 2000, the OCCA affirmed the convictions and sentences for Counts I (murder) and II (conspiracy), but reversed and remanded the conviction and sentence for Count III (attempted murder) with instructions to dismiss. Stemple, 994 P.2d at 74-75. The OCCA denied a rehearing on March 2, 2000. Id. at 61. The United States Supreme Court denied Stemple's subsequent petition for writ of certiorari on October 2, 2000. See Stemple v. Oklahoma, 531 U.S. 905 (2000). Stemple did not file an application for post-conviction relief in the state courts.

Stemple initiated the instant habeas corpus proceedings on March 8, 2001. See Dkt. # 1.  He seeks relief on the following grounds:

> Ground One:  The prosecution's failure to disclose substantial changes in the testimony of its main witness violated Stemple's rights to due process and of receiving a fundamentally fair trial.
>
> Ground Two:  Constitutional error occurred when the trial court admitted, and the State commented upon, Stemple's videotaped statement to police wherein he invoked his right to remain silent and his right to counsel.
>
> Ground Three:  The admission into evidence of a "confession" obtained from Stemple by force and under duress by inmates in the Tulsa County Jail resulted in a fundamentally unfair trial.

See Dkt. # 21.

## GENERAL CONSIDERATIONS

## I.   Exhaustion

Generally, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b)(1)(A). Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S.

72, 80-81 (1977) (reviewing history of exhaustion requirement). In every habeas case, the Court must first consider exhaustion. <u>Harris</u>, 15 F.3d at 1554. "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991). Respondent contends that some of Stemple's claims are unexhausted. Therefore, the Court will address the exhaustion issue as it arises in each ground.

## II.    Procedural Bar

The Supreme Court has also considered the effect of state procedural default on federal habeas review, giving strong deference to the important interests served by state procedural rules. <u>See</u>, <u>e.g.</u>, <u>Francis v. Henderson</u>, 425 U.S. 536 (1976). Habeas corpus review is barred if a state disposed of an issue on an adequate and independent state procedural ground.   <u>Coleman</u>, 501 U.S. at 750; <u>see</u> <u>also</u> <u>Romero v. Tansy</u>, 46 F.3d 1024, 1028 (10th Cir. 1995); <u>Brecheen v. Reynolds</u>, 41 F.3d 1343, 1353 (10th Cir. 1994).

A state court's finding of procedural default is deemed "independent" if it is separate and distinct from federal law. <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985); <u>Duvall v. Reynolds</u>, 139 F.3d 768, 796-97 (10th Cir. 1998).  If the state court finding is applied "evenhandedly to all similar claims," it will be considered "adequate." <u>Maes v. Thomas</u>, 46 F.3d 979, 986 (10th Cir. 1995) (citing <u>Hathorn v. Lovorn</u>, 457 U.S. 255, 263 (1982)). A state court's application of a procedural bar will be excused where a petitioner can demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. <u>Coleman</u>, 501 U.S. at 749-50.

In general, the OCCA imposes a procedural bar on claims which could have been raised on

direct appeal but were raised by a petitioner for the first time in post-conviction proceedings. In this case, Stemple did not file an application for post-conviction relief so there was no finding of procedural default by the OCCA.  However, Respondent's contention that certain issues are subject to an anticipatory procedural bar[3] will be discussed as the issue arises.

## III.    Standard of Review - AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes the guidelines under which a federal court may grant habeas relief. Under AEDPA, a writ of habeas corpus will not be granted unless the state court's adjudication of the merits of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)(2). This Court must presume the state court's factual findings are correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The first step in applying § 2254(d)(1) AEDPA standards is to assess whether there was clearly established federal law at the time the conviction became final, as set forth in the holdings of the Supreme Court. House v. Hatch, 527 F.3d 1010, 1015 (10th Cir. 2008). If clearly established federal law exists, the Court must then consider whether the state court decision was contrary to or involved an unreasonable application of the Supreme Court law. Id. at 1018. A state court decision

___

[3] A claim raised for the first time in federal habeas proceedings may be subject to an anticipatory procedural bar if the claim is technically unexhausted, but any attempt to present it to Oklahoma state courts would result in a procedural bar ruling under state law. See Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007).

is "contrary" to clearly established law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). A state court decision is an "unreasonable application" of clearly established law when the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (citing Williams v. Taylor, 529 U.S. 362, 413 (2000)). Further, an unreasonable application "may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply." House, 527 F.3d at 1018.

Stemple's habeas proceedings in the instant case commenced well after the effective date of the AEDPA. Accordingly, this Court finds that the AEDPA is applicable and will apply it herein to all claims adjudicated on the merits in state court proceedings.

## IV.    Expansion of the Record

On October 21, 2001, contemporaneously with the filing of his petition (Dkt. # 21), Stemple filed a motion to expand the record (Dkt. # 23). In the motion, Stemple asks the Court to include in the record additional materials set forth as exhibits "A" through "T" (Dkt. # 22).  The additional materials consist primarily of police reports and crime scene analysis reports.  In his response to the petition, Respondent objects to Stemple's request for expansion of the record (Dkt. # 33 at 68-69). Respondent argues that supplementation of the record, as requested by Stemple, would thwart the exhaustion principles of the AEDPA. Id. at 69. Both parties re-urge their positions regarding expansion of the record in their joint certification of the state court records (Dkt. # 37 at 3). On

September 30, 2002, Magistrate Judge Cleary entered a minute order denying the motion to expand the record "pending a review of the entire record." See Dkt. # 46. The Court has reviewed the entire record, together with the materials which Stemple seeks to have added to the record, and finds that the motion to expand (Dkt. # 23) should be granted. See Rule 7, Rules Governing Section 2254 Cases in the United States District Courts.[4]  The Court has considered the expanded record in its resolution of the issues presented in Stemple's petition.

**PETITIONER'S GROUNDS FOR RELIEF**

**I.       Hunt's changed testimony**

The controversy in Stemple's first ground for relief centers around the testimony of Terry Hunt,[5] Stemple's co-defendant and a key witness linking Stemple to the murder of his wife. Stemple asserts that the prosecutor's failure to disclose prior to trial that Hunt would change his testimony regarding details of the murder violated his constitutional rights to a fair trial and due process. See Dkt. # 21 at 12-265. Specifically, Stemple complains that Hunt testified for the first time at trial that he and Stemple ran over the victim's chest. Stemple argues that Hunt never mentioned this fact in

---

[4] This Court is aware that Rule 7(c) of the Federal Rules Governing Section 2254 Cases provides that where expansion of the record is directed, the opposing party shall be afforded an opportunity to admit or deny the correctness of the material contained within the expanded record. Respondent clearly reviewed the materials as reflected in his response objecting to inclusion of the materials in the record (Dkt. # 33 at 68). Since, however, the correctness of the information contained in exhibits "A" through "T" of Docket # 22 does not alter the resolution of Stemple's claims, it is unnecessary to give Respondent an additional opportunity to admit or deny the correctness of the material. Consideration of the exhibits did not alter the Court's resolution of Stemple's claims.

[5] Terry Hunt entered a guilty plea to the First Degree Murder charge and received a sentence of life imprisonment. See December 18, 1997 docket entry for Tulsa County District Court Case No. CF-1996-5169 at www.oscn.net.

previous statements or during his preliminary hearing testimony,[6] and that the prosecution coached Hunt to ensure his trial testimony coincided with the physical evidence and the medical examiner's testimony. Stemple contends that the prosecution's failure to divulge this "significant addition of material fact" to Hunt's testimony was a violation of Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). See Dkt. # 21 at 265. He argues that Hunt's surprise testimony hampered his attorney's ability to cross-examine the State's witnesses as planned. See, e.g., Dkt. # 21 at 74, 84. Stemple also alleges that these trial tactics by the State undermined the fundamental fairness of his trial, citing Donnelly v. DeChristoforo, 416 U.S. 637 (1974). See Dkt. # 21 at 264. Finally, he asserts an ineffective assistance of counsel claim pursuant to Strickland v. Washington, 466 U.S. 668 (1984).

*Standard of Review*

The threshold question is what standard of review to apply to this issue. Respondent contends that Stemple's first ground for relief is unexhausted and, thus, procedurally barred because "it relies on a plethora of extra-record materials never presented in state court." See   Dkt. # 33 at 8. Alternatively, Respondent argues that Stemple has not demonstrated a Brady violation because the change in Hunt's testimony was not "material" as required by Brady. Id. at 54.  Brady requires a

---

[6] At Stemple's preliminary hearing, Hunt testified that he first hit Trisha Stemple in the head with a baseball bat, then Stemple hit her several times with the bat. See Trans. of Prelim. H'rg at 17-19. Next, both men placed the victim "under the tire" of the truck to try to run over her, but the wheel "skidded her head." Id. at 20. Hunt described their further efforts to kill the victim using the bat and the truck, until they were certain she was dead. Id. at 20-24. No specific mention was made of running over the victim's chest with the truck. During his trial testimony, Hunt expanded his description of the events of the murder by stating that he and Stemple placed the victim's chest under the front wheel before running over her. Tr. Trans. Vol. IV at 704. Hunt testified that he drove "up on her chest, but it just rolled over." Id. at 705. Defense counsel immediately objected to this testimony claiming it was the first time Hunt had give any information about running over the victim's chest. Id. at 706.

finding of materiality as to any suppressed evidence. See Brady, 373 U.S. at 87. Respondent urges that to the extent this claim was raised on direct appeal the Court should find that the OCCA's adjudication was not an unreasonable application of clearly established federal law. Dkt. # 33 at 58.

On direct appeal, Stemple argued in his second proposition that the prosecution violated discovery principles and constitutional rules in several instances. Among the claims was an allegation that the state improperly allowed and encouraged Hunt to change his trial testimony to match the crime scene evidence, including Hunt's "new" testimony about running over the victim's chest. See Brief of Appellant in OCCA Case No. F-98-201 at 8-28. Although the title to Stemple's direct appeal second proposition referenced "constitutional rules," the majority of his argument focused on state discovery code violations and cited state law authorities. Only in the final paragraph did Stemple cite several federal cases which, in turn, relied upon Brady. Id. at 28. Stemple made no specific reference to the Giglio or Donnelly cases. Not surprisingly, there is no mention of federal constitutional law in the OCCA's opinion disposing of the second proposition in Stemple's direct appeal. Thus, this Court must determine whether the federal constitutional issue is (a) unexhausted and procedurally barred (as Respondent first argues), (b) implicitly rejected on the merits by the OCCA, and subject to normal AEDPA standards of review, or (c) overlooked by the OCCA and subject to de novo review by this Court. See Johnson v. Mullin, 505 F.3d 1128, 1154 (10th Cir. 2007). For the reasons stated below, the Court concludes that insofar as Stemple raises a Brady claim in his first ground for relief, the claim is exhausted because the OCCA considered and rejected the claim on the merits.

Accordingly, Stemple can prevail only if he demonstrates that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Even though the OCCA's decision on the merits lacks analysis in terms of federal law, its ruling is entitled to deference under § 2254(d) unless it contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented. Aycox v. Little, 196 F.3d 1174, 1178 (10th Cir. 1999) (explaining that state court decisions can pass muster under § 2254(d) even without citation to relevant Supreme Court decisions so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court precedents).

In denying Stemple's second proposition on direct appeal, the OCCA found that Hunt's change in testimony was not "sufficient to trigger the State's continuing duty to disclose." Stemple, 994 P.2d at 67. Further, "[t]his was inconsequential testimony and did not constitute the substance of the case." Id. The OCCA focused its decision on state law and did not specifically reference Brady or any other federal law. The state appellate court did, however, address the materiality of Hunt's change in testimony, as follows:

> In this case there was no complete failure to disclose evidence as there was in *Skelly v. State*, 1994 OK CR 55, 880 P.2d 401. In the present case, the prosecutor did turn over all written and recorded statements. But the State did not disclose the substance of Hunt's oral statements made just before testifying. Stemple cites the Florida case of *Evans v. State*, 721 So.2d 1208 (Fla. App. 1998) for support of this proposition. However, in *Evans* the witness's testimony changed from "I didn't see anything" to "I saw the defendant shoot the victim." Such a material change in testimony did not occur in this case.

> The Supreme Court of Florida has stated that,

>> "When testimonial discrepancies appear, the witness' trial and deposition testimony can be laid side-by-side for the jury to consider. This would serve to discredit the witness and should be favorable to the defense. Therefore, unlike failure to name a witness, changed testimony does not rise to the level of a discovery violation . . ."

13

> *Bush v. State*, 461 So.2d 936, 938 (Fla. 1984), *cert. denied*, 475 U.S. 1031, 106 S.Ct.
> 1237, 89 L.Ed.2d 345 (1986). The same can be said of the case at bar. Stemple had
> the opportunity and did question Hunt regarding the discrepancies in his trial
> testimony versus his preliminary hearing testimony and his recorded statements.
> These discrepancies served to discredit Hunt and made him somewhat less
> believable.
>
> The State is not required to give a script of its case in chief. However, the State is
> under a continuing duty to disclose additional evidence or material discovered prior
> to or during trial. 22 O.S.Supp.1998, § 2002(C). Such failure to disclose may be error
> when this evidence is material, would change the theory of the case or would cause
> the defendant to change his strategy. However, in this case, the State did not violate
> the letter or the spirit of the Discovery Code by failing to inform Stemple of the
> discrepancies in Hunt's testimony.

Stemple, 994 P.2d at 67-68.

Stemple does not contest the OCCA's analysis in terms of the AEDPA standards of review.

Indeed, throughout his 253 pages of argument addressing ground one, he makes no mention at all

of the OCCA's analysis. Instead, Stemple simply challenges the testimony and physical evidence

presented at his trial by comparing and contrasting various parts of the State's evidence with his own

version of events. Pages 105 through 264 of Stemple's petition consist solely of quoted testimony

from the trial transcript, interspersed with 108 numbered sentences of commentary. Stemple seems

to be under the misconception that this Court can find him innocent by reviewing the fact-related

arguments he presents. See Dkt. # 21 at 13 ("The following detailed exposition of the facts is

presented to show the court . . . that Patricia Stemple died as a result of an autopedestrian collision -

in direct contradiction of the trial testimony of Terry Hunt."); id. at 26 ("Stemple . . .  fully

recognizes that the record appears to support the conviction . . . [but] finds himself in the position

where he can easily demonstrate his innocence of the allegations made against him at trial. . . .").

This Court's role on habeas review is limited to determining whether the OCCA's rejection of

Stemple's direct appeal claims was contrary to, or involved an unreasonable application of, clearly

established federal law as determined by the Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)(2).

Further, although Stemple couches his ground one claim as a due process and fair trial claim, he cites federal authority in only two places[7] in the entire ground one portion of his petition. Pages 23 and 264-65 contain fleeting references to Donnelly, Brady, and Giglio.  In an abundance of caution, however, this Court will assume that Stemple is implying that the OCCA unreasonably applied the law of these Supreme Court cases in rejecting his challenge to the State's alleged failure to disclose changes in Hunt's testimony.

<em>Brady</em> violation

The law is well settled that criminal convictions obtained by presentation of known false evidence, or by suppression of exculpatory or impeaching evidence, violate the due process guarantees of the Fourteenth Amendment.  Napue v. Illinois, 360 U.S. 264 (1959); Brady, 373 U.S. 83; Giglio, 405 U.S. at 153-54.  In order to establish a Brady prosecutorial misconduct violation, a habeas petitioner must show that: (1) the prosecution suppressed evidence, (2) the evidence was favorable to the accused, either exculpatory or impeaching, and (3) the evidence was material to the defense.  Banks v. Dretke, 540 U.S. 668, 691 (2004); Kyles v. Whitley, 514 U.S. 419, 433 (1995); United States v. Bagley, 473 U.S. 667, 682 (1985). Under the facts of this case, the Court's inquiry focuses on the third prong addressing the materiality of the alleged suppressed evidence. Exculpatory evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable

---

[7] Stemple also refers to the State's alleged "*Brady* violation" on page 44 of his petition.

probability' is a probability sufficient to undermine confidence in the outcome." <u>Bagley</u>, 473 U.S.

at 682.   "The mere possibility that an item of undisclosed information might have helped the

defense, or might have affected the outcome of the trial, does not establish 'materiality' in the

constitutional sense." <u>United States v. Agurs</u>, 427 U.S. 97, 109-110 (1976). As noted by the Tenth

Circuit Court of Appeals:

> The Supreme Court has further refined the <u>Brady/Bagley</u> materiality standard as
> follows:
>
>> Bagley's touchstone of materiality is a "reasonable probability" of a
>> different result, and the adjective is important. The question is not
>> whether the defendant would more likely than not have received a
>> different verdict with the evidence, but whether in its absence he
>> received a fair trial, understood as a trial resulting in a verdict worthy
>> of confidence.
>
> <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing
> <u>Bagley</u>, 473 U.S. at 678, 105 S.Ct. 3375). <u>See</u> <u>also</u> <u>Scott v. Mullin</u>, 303 F.3d 1222,
> 1230-31 (10th Cir.2002). When engaging in a materiality analysis, we are not to
> consider each piece of withheld evidence in isolation. <u>Banks</u>, 54 F.3d at 1518.
>
>> Rather, we review the cumulative impact of the withheld evidence;
>> its utility to the defense as well as its potentially damaging impact on
>> the prosecution's case. Furthermore, . . .  we evaluate the materiality
>> of withheld evidence in light of the entire record in order to
>> determine if the omitted evidence creates a reasonable doubt that did
>> not otherwise exist. What might be considered insignificant evidence
>> in a strong case might suffice to disturb an already questionable
>> verdict.
>
> <u>Id.</u> (internal citations and quotations omitted).

<u>Snow v. Sirmons,</u>  474 F.3d 693, 711 (10th Cir. 2007).  Stemple bears the burden of presenting

evidence to establish a <u>Brady</u> violation. <u>Foster v. Ward</u>, 182 F.3d 1177, 1191 (10th Cir. 1999). It is

also Stemple's burden under 28 U.S.C. § 2254(d) to show how the state court's determination of this

issue was contrary to clearly established federal law as set forth by the Supreme Court, or that there

was an unreasonable application of such law to the facts of this case. Stemple alleges the state's failure to disclose changes in Hunt's testimony violates <u>Brady</u> because his defense strategy was to attack Hunt's testimony and demonstrate that it could not be corroborated by the crime scene evidence. Thus, when Hunt changed his testimony about what occurred at the crime scene, defense counsel could no longer employ that strategy because the changed testimony more closely matched the crime scene evidence than Hunt's previous testimony at the preliminary hearing.

In this case, after reviewing the alleged "changed" testimony of witness Terry Hunt in light of the entire record, the Court concludes that the State's failure to advise Stemple of Hunt's "new" version of events does not create a reasonable probability that the verdict would have been different. <u>Kyles</u>, 514 U.S. at 434. Even if Stemple had been advised of Hunt's expanded testimony in advance, defense counsel's use of this information likely would not have created a reasonable doubt as to Stemple's guilt.

There is no question that there were discrepancies in Hunt's version of events as he initially told his story to police, later at the preliminary hearing, and finally when he testified at Stemple's trial. At one point during a bench conference, the prosecutor even admitted, "I don't know [if] anything coming out of this guy's mouth is going to be consistent." <u>See</u> Tr. Trans. Vol. IV at 691. Despite variations in the details of Hunt's story, however, certain important points remained constant. He consistently reported and testified that: (1) Stemple approached him about helping kill Trisha Stemple in exchange for $25,000 - $50,000; (2) Stemple directed Hunt to purchase a baseball bat to be wrapped in cellophane and used as the murder weapon; (3) Stemple chose the time and place for the attack on his wife; (4) Hunt drove the red pickup truck to the site on Highway 75 chosen by Stemple, left the hood up as if the vehicle were disabled, then hid on the side of the road

until Stemple and his wife arrived; (5) Hunt dealt the initial blows with the baseball bat to the back of the victim's head; (6) Stemple delivered more blows to the victim with the bat; (7) the victim attempted to get up and crawl away even after she had been struck numerous times; (8) Stemple and Hunt tried to run over the victim's head but were unsuccessful; (9) after Stemple and Hunt left the victim for dead, they turned around and came back to find she was not yet dead so they ran over her with the truck; (10) Stemple drilled a hole in the tire of the car which he and the victim had driven to the scene, so that it would appear she had a flat tire; and (10) after the deadly assault on the victim, Hunt dropped Stemple off near his home in Jenks, then returned to his own home on Second Street in Tulsa.  See Dkt. # 22, Ex. P; Trans. of Prelim. H'rg dated December 30, 1996, at 6-109; Tr. Trans. Vol. IV at 668-801.

As to Hunt's "new" testimony about running over the victim's chest, Stemple's trial counsel conducted the following cross-examination:

Q:      When you discussed this with the prosecutor, you say they didn't tell you what to say, they told you the areas in which they would be examining you, didn't they?

A:      Yeah, I believe so, that's what they said.

Q:      Told you what questions they were going to ask you, didn't they?

A:      They said what all exact certain topics that they were going to cover and --

Q:      Did they tell you there were difficulties between the crime scene and what you were testifying to as far as a huge puddle of blood out there that wouldn't fit in unless somebody's chest was run over or some serious injury was done with a car at that point?

A:      They didn't tell me about the blood.  They asked me if I run over -- put the truck on her chest, and I told him yes, and then --

Q:      They asked you if you put the truck on her chest?

A:      They said that on the docket, the court docket, that it said that I had run over her, and

18

I replied, yes, I did.

Q:      They said that on the court docket.  What do you believe a court docket to mean, sir?

A:      I don't know, where the thing states of the charges I've been charged with, what they gave me when I first was arrested showing the charges that had been.

Q:      They told you that charges said that you had run over her chest?

A:      Yes, sir.

Q:      And though you never mentioned it in preliminary hearing, never mentioned it in a statement --

A:      I didn't read all of that and I didn't see it in there.  They notified me of it.

Q:      And you agreed with it?

A:      No, I told them that I did.

Q:      Who would have provided that information to them if not you, sir?

A:      Who would have --

Q:      If they told you that the court docket said that you had run over her chest, who but you could have provided them that information, if you know?

A:      Who?  Well, whoever told them -- I believe Nathaniel Helm.

Q:      Well, sir, how would Nathaniel Helm know you ran over her chest if he never talked to you about it, if all he knew about was a purported plan?

A:      Because that was part of the plan.

Q:      To run over her chest?

A:      Yes, sir.

Q:      Thank you, sir.

Tr. Trans. Vol. IV at 799-801.  Further, Stemple's trial attorney spent a good portion of his closing

argument challenging the credibility of various witnesses, including Terry Hunt, and pointing out

19

the inconsistencies in their testimony. <u>See</u> Tr. Trans. Vol. X at 1944-85. Despite defense counsel's efforts, the jury ultimately concluded that Stemple was guilty of murdering his wife.

In deciding whether Stemple's guilty verdict was worthy of confidence, <u>Kyles</u>, 514 U.S. at 434, the Court considered the withheld information regarding Hunt's testimony in light of the entire record to determine if the omission created a reasonable doubt that did not otherwise exist. <u>Snow</u>, 474 F.3d at 711; <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1518 (10th Cir. 1995). The State presented substantial evidence of Stemple's guilt and participation in the murder independent of Hunt's testimony. Much of the evidence corroborated various portions of Hunt's version of events.

Nathaniel Helm, friend of Terry Hunt, testified that on October 10, 1996, he and Hunt purchased a baseball bat and Saran Wrap to "help kill someone for like $50,000." Tr. Trans. Vol. IV at 817-18. He also testified that 3 or 4 days later he accompanied Hunt to a specified location on Highway 75 when Stemple drove up in a black Nissan Maxima, got out of the car and told Hunt in a "loud, angry tone" that "the bitch can't make it." <u>Id.</u> at 818-23. Although at that point, Helm did not know who the intended victim of the murder was, he understood that they could not go through with the plan that night because "she was sick." <u>Id.</u> at 827-28. Helm testified further that a couple of weeks after the "initial try" Hunt told him they were going to try again the evening of October 24, 1996. <u>Id.</u> Helm decided not to accompany Hunt on this second attempt. <u>Id.</u> Finally, Helm testified that Hunt later told him that he and "Shaun" had "hit her with a baseball bat" numerous times, then ran over her with the truck because she was still alive. <u>Id.</u> at 833.

The medical examiner, Dr. Robert Hemphill, confirmed that the victim had multiple blunt injuries that were consistent with being hit by a bat. Tr. Trans. Vol. V at 1028-29.

An insurance agent, Ronald Archer, testified that he sold the Stemples life insurance policies

which, among other things, insured the victim for $600,000, and an additional $350,000 in the event of an accidental death. Tr. Trans. Vol. VI at 1060.  The Stemples applied for the insurance in the Fall of 1995. <u>See</u> State's trial exhibit No. 81 attached to Tr. Trans. Vol. VI.

Witness Rick Robertson, co-owner of Robertson Tire Company, testified that he examined the flat tire from the victim's car and concluded that it had not been driven on at all while it was flat. Tr. Trans. Vol. VI. at 1084. Witness, Carol Cox, a criminalist for the Tulsa police department, also examined the flat tire. She testified that the inside of the hole in the tire revealed spiral cuts.

Witness Chris Hockett testified that, while driving in the vicinity of the murder, he saw a white male standing beside a red truck at approximately 2:55 a.m. on the morning of the crime. <u>Id.</u> at 1111. He observed the red truck parked just behind a dark, subcompact car with a flat tire. <u>Id.</u>

Dani Wood, Terry Hunt's cousin, testified that she and Stemple began a sexual relationship sometime in 1995. <u>Id.</u> at 1141. She also testified that Stemple had told her he was unhappy with his wife because she "kept leaving him and the kids" and was "an unfit mother." <u>Id.</u> at 1140-41. Wood indicated that she had introduced Hunt to Stemple, and knew that they had spent some time together. <u>Id.</u> at 1142, 1146. Wood also testified that Stemple left her apartment around 10 p.m. the evening before the murder and did not sleep at her place that night. <u>Id.</u> at 1151.

Finally, the State presented evidence of multiple confessions and incriminating statements made by Stemple to his cellmates in the Tulsa County Jail while awaiting trial. Ramon Macon testified that Stemple told him "he wanted some people [Terry Hunt and Dani Wood] taken care of on the outside." Tr. Trans. Vol. VII at 1290. Stemple paid Macon $1500 as a down payment to "take care of those witnesses." <u>Id.</u> at 1299. Stemple gave Macon a signed, handwritten confession, in which Stemple said:

> I, Timothy Shaun Stemple, on the night my wife died had possession of the 1978 Ford pickup truck and did luer [sic] her out to the 8500 block of South Highway 75 and did with malice aforethought murder Trisha Stemple by means of running her over with aforementioned 1978 red Ford pickup truck. Terry Hunt and I beat her with a baseball bat and through [sic] her in front of the truck. I ran over her repeatedly. Then Terry took me home and I called 911. Terry Hunt who I was to pay _____ $25,000 dollars for the job was to take the truck out of state but he punked out and kept the vehicle in Tulsa until he was caught.

Id. at 1295-96; State's trial exhibit 88-A attached to Tr. Trans. Vol. VII. During his defense testimony, Stemple admitted writing the confession, but explained that he did so while under duress and in fear for his family's safety. Tr. Trans. Vol. IX at 1750, 1856-57. Macon testified that he suspected Stemple was a police officer, and asked Stemple to put everything down on paper to convince him otherwise. Tr. Trans. Vol. VII at 1292.

Cellmate William Campion testified that Stemple asked him if he knew "anybody that could take care of his girlfriend, Dani Wood, because she was the only one that could really put him in for life." Tr. Trans. Vol. VII at 1334. Stemple provided sample letters that he wanted Wood to rewrite and sign prior to her death to exonerate Stemple and pin Trisha Stemple's murder on Hunt and Helm. Id. at 1335; State's trial exhibits 89, 91 attached to Tr. Trans. Vol. VII.

Cellmate Herbert James Johnson testified that he developed a rapport with Stemple while housed in jail. He testified that Stemple eventually confided that he had "come up with a way to get rid of his wife" and "come up with a bunch of cash too." Id. at 1411. The description of the events of the murder, as told to Johnson by Stemple, corresponded to Hunt's version.

The State produced various other writings, including, but not limited to, a detailed map of the crime scene (State's trial Ex. 88-A), instructions on how to coax Hunt into writing a letter exonerating Stemple (State's trial Ex. 88-C), and a description of Dani Wood's living habits (State's trial Ex. 90) for use by the person who was supposed to "take care of her." Stemple admitted that

22

he wrote the documents, but testified that he did so under duress or for the purpose of trying to figure out what exactly happened the night of the murder. Tr. Trans. Vol. IX at 1750, 1856-57.

Upon consideration of all the evidence, the Court finds that the challenged testimony by Hunt was immaterial to the jury's finding of guilt.  Further, when viewed in light of the entire evidence presented at trial, nothing in Hunt's expanded testimony would have been material to the jury's assessment and recommendation of punishment in the second stage. See Cone v. Bell, -- U.S. --, 129 S.Ct. 1769 (2009). Having failed to provide any argument or authority which satisfies his burden under AEDPA, Stemple is not entitled to habeas relief on his ground one Brady claim.

*Giglio* and *Donnelly* claims

The brief and unsupported references to constitutional violations under Giglio[8] and Donnelly in Stemple's first ground were not presented to the OCCA, and are technically unexhausted. Federal courts generally should dismiss habeas petitions containing unexhausted claims. Rose v. Lundy, 455 U.S. 509, 510 (1982). Nonetheless, this Court may "deny relief on the merits of a claim even if that claim has not been exhausted in state court." Spears v. Mullin, 343 F.3d 1215, 1234 (10th Cir. 2003); 28 U.S.C. § 2254(b)(2). Interests of comity and federalism underlie this principle, as well as avoiding litigation in state courts. Hoxsie v. Kerby, 108 F.3d 1239, 1242 (10th Cir. 1997) (citing Granberry v. Greer, 481 U.S. 129, 134 (1987)). In this case, the Court finds that the unexhausted portions of Stemple's first ground for relief should be denied on the merits. 28 U.S.C. § 2254(b)(2).

Stemple's only reference to the Giglio case is found in the conclusion to his ground one

---

[8] The Giglio court reaffirmed a long-standing rule that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" Giglio, 405 U.S. at 766 (citing Mooney v. Holohan, 294 U.S. 103 (1935); Pyle v. Kansas, 317 U.S. 213 (1942)).

23

claim, where he states:

> The prosecutors in Stemple's case had a constitutional obligation to divulge to the defense information concerning the credibility of its star witness, Terry Hunt, and the significant addition of material fact to his testimony.  Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972).

See Dkt. # 21 at 265.  He does not provide any further argument or discussion beyond this cursory mention of the case.  This Court will not craft Stemple's legal theories for him.  His perfunctory mention of the Giglio case is insufficient to convince this Court that a constitutional violation occurred.

Likewise, Stemple has failed to convince the Court that the fundamental fairness of his trial was undermined as proscribed in Donnelly.  This Court finds that the prosecutor's failure to advise defense counsel of the changes in Hunt's testimony did not make Stemple's trial "so fundamentally unfair as to deny him due process." Donnelly, 416 U.S. at 645.  See also Agurs, 427 U.S. at 108.

*Ineffective assistance of counsel*

Finally, Stemple asserts at the end of his ground one argument that, "[t]o the extent that the prosecutors in this case engaged in trial by stealth and presented a significantly different case than defense counsel was lead to believe, Stemple was deprived by the State of the effective assistance of trial counsel pursuant to Strickland v. Washington, 466 U.S. 668 (1984)." Dkt. # 21 at 265. This allegation fails to state a claim. Stemple has presented no case law to support a claim of ineffective assistance where the prosecution's conduct allegedly caused the deficient performance, and the Court is aware of none. The clearly established Supreme Court law on the issue of ineffective assistance of counsel is set forth in Strickland, and requires the Court to examine the conduct of the petitioner's lawyer, not the conduct of the prosecutor. See Strickland, 466 U.S. at 687.  Absent any authority that permits an ineffective assistance claim where the prosecution caused the deficient

performance, the Court finds that Stemple has failed to present a colorable claim of ineffective assistance of counsel in ground one. This allegation will be denied.

*Conclusion*

Stemple's jury was presented with both physical evidence and the testimony of numerous witnesses, including Stemple, before concluding that Stemple murdered his wife. See United States v. Scheffer, 523 U.S. 303, 313 (1998) ("A fundamental premise of our criminal trial system is that the *jury* is the lie detector. Determining the weight and credibility of witness testimony, therefore, has long been held to be the part of every case that belongs to the jury. . . ." (quotations omitted)). Although Stemple vigorously contests the veracity of the State's witnesses and urges this Court to accept his own version of the "truth," that is not the function of this Court in a habeas proceeding. "The Anglo-Saxon tradition of criminal justice, embodied in the United States Constitution and in federal statutes, makes jurors the judges of the credibility of testimony offered by witnesses. It is for them, generally, and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." United States v. Bailey, 444 U.S. 394, 414-15 (1980).

The OCCA affirmed Stemple's murder conviction. It is Stemple's burden under 28 U.S.C. § 2254(d) to show how the state court's determination of his ground one claim was contrary to clearly established federal law as set forth by the Supreme Court or that there was an unreasonable application of Supreme Court law to the facts of this case. To the extent Stemple's ground one claim is exhausted, he has failed to convince this Court that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)(2).  His conclusory claims relying on Giglio and Donnelley are without merit, and his assertion of ineffective assistance of counsel fails

25

to state a claim. Having failed to satisfy his burdens under AEDPA, Stemple is not entitled to habeas corpus relief on his ground one claim.

**II.      Stemple's videotaped interview with police**

In his second proposition of error, Stemple claims that the introduction at trial of his videotaped interview with police violated his rights guaranteed by the Fifth Amendment. See State's trial exhibit 87. The videotaped interview ended when Stemple announced unequivocally that he was going to get an attorney. Stemple also alleges that his trial attorney was constitutionally ineffective for failing to object to the prosecution's comments and cross-examination questions regarding the videotaped interview. Stemple raised these constitutional issues on direct appeal. The OCCA denied relief. Stemple, 994 P.2d at 68-69. Stemple contends that the OCCA's ruling was an unreasonable application of Supreme Court law.  See Dkt. # 21 at 275, 276-77.

The Fifth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself. In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467. In Davis v. United States, 512 U.S. 452 (1994), the Supreme Court held that a request for counsel must not be "ambiguous or equivocal." Id. at 459. The Davis Court considered whether the statement "Maybe I should talk to a lawyer" was an ambiguous request for an attorney. The Supreme Court stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of

26

questioning." <u>Id.</u>

In the brief interview shown on the videotape (State's trial exhibit 87), Stemple made three references to getting an attorney. Near the beginning of the interview, and before he had been read his <u>Miranda</u> rights, Stemple said "I feel as though I should have an attorney." He continued talking and expressed concern about "how it looks" because of the life insurance policy on his wife, his extramarital affair, his ownership of a red truck, and an acknowledgment that he was at the crime scene. Relying on <u>Davis</u>, the OCCA found:

> The portion of the tape, before Stemple was the read the *Miranda* warning, was admissible. Stemple did not unequivocally invoke his rights. Therefore, questioning did not need to cease.

<u>Stemple</u>, 994 P.2d at 61.  After watching the videotape, the Court agrees with the OCCA that this first statement regarding an attorney was ambiguous and equivocal, and the interrogating officer was not required to cease the interview at that point. Stemple's statement that he felt as though he should have an attorney was ambiguous as in <u>Davis</u>. Whether a statement constitutes an unequivocal request for counsel under <u>Davis</u> is a question of law. <u>Valdez v. Ward</u>, 219 F.3d 1222, 1232 (10th Cir. 2000). The OCCA correctly cited <u>Davis</u>, and applied its holding when reviewing this claim.

After being read his <u>Miranda</u> rights, Stemple made a second reference to getting an attorney by saying, "I better get an attorney." Even if the second reference is deemed to have been an unambiguous and unequivocal invocation of his right to counsel, Stemple reinitiated communication with police by continuing to talk. He asked if he was being arrested, if he could make an appointment to come back with his attorney that same day, and reaffirmed that he wanted to help. Upon invoking a right to counsel, a defendant is not subject to further interrogation until counsel is available unless he "himself initiated further communication, exchanges, or conversations with the

police." <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). If the police initiate subsequent contact without the presence of counsel, his statements will be presumed involuntary. <u>See</u> <u>McNeill v. Wisconsin</u>, 501 U.S. 171, 177 (1991). In this case, Stemple kept talking after he said he "better get an attorney," without initiation of subsequent contact by police. Thus, the few statements he made thereafter were not subject to suppression on the ground that they were made in violation of his constitutional rights.

In response to Stemple's  inquiry whether he was being arrested, the police officer advised him that he was not.  At this point the officer commented that "You know what happened," and Stemple replied, "I do." Stemple then stated, "I'm gonna get an attorney," and the interview ended. Stemple's last statement, "I'm gonna get an attorney," is unequivocal and the interrogating officer ceased questioning as required under <u>Davis</u>. Based upon a review of the videotape, the Court concludes that all of Stemple's comments, questions, and responses were made prior to his unequivocal statement that he was going to get an attorney.

Stemple has failed to rebut, by clear and convincing evidence, the presumption of correctness afforded the state court's factual finding that his references to an attorney made before his <u>Miranda</u> rights were explained were ambiguous and equivocal. Further, the OCCA's application of <u>Davis</u> was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Stemple has not demonstrated he is entitled to habeas corpus relief on the ground that the videotape was improperly admitted as evidence before the jury.

Stemple next claims that his trial attorney provided constitutionally ineffective assistance in failing to object to the admission of the videotape and in failing to object to the prosecutor's use of Stemple's comments on the videotape in his arguments before the jury. In evaluating a claim of

28

ineffective assistance of counsel, this Court applies the familiar two-pronged standard established in Strickland v. Washington, 466 U.S. 668 (1984). See United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995). To establish ineffective assistance of counsel a petitioner must show that his counsel's performance was deficient and that the deficient performance was prejudicial. Strickland, 466 U.S. at 687; Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993). A petitioner can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases. Strickland, 466 U.S. at 687-88. There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688. In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Moreover, review of counsel's performance must be highly deferential. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. To establish the second prong, a defendant must show that this deficient performance prejudiced the defense, to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Sallahdin v. Gibson, 275 F.3d 1211, 1235 (10th Cir. 2002); Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999).

Insofar as Stemple contends his counsel was ineffective for failing to object[9] to the admission of the videotape, the Court finds the claim is without merit because the videotape was admissible

---

[9] Although defense counsel did not specifically object to the admission of the videotape, the trial judge asked if he wanted "an exception" after ruling that the evidence was allowed. See Tr. Trans. Vol. VII at 1281. The attorney responded in the affirmative. Id.

under constitutional standards as discussed above. His assertion that trial counsel failed to object to the prosecution's use of the videotape evidence in closing argument requires additional analysis. The OCCA found that counsel's failure to raise the objection in closing argument "did not rise to the level of deficient performance, as the comments were properly based on admissible evidence." Stemple, 994 P.2d at 72. The Court agrees.

In this case, the focus of the prosecutor's comments was on the substance of Stemple's statements during the interview. During the State's case in chief, the prosecutor introduced the videotape as State's exhibit 87 through the testimony of Detective Fred Parke. See Tr. Trans. Vol. VII at 1280. The tape was played for the jury. Id. at 1281. During cross-examination of Stemple, the prosecutor asked him why he made the following statements during the taped interview:

> Q:      Do you remember the statement, by you: "I know how bad this looks on me so my fear is that you guys -- you guys are, inaudible, I think you're here to prove I did it, not to find out, inaudible, and I know you're saying not, but that is my fear. And, inaudible, question that I answer I'm gonna be choosy about it and of course it's going to make me look worse because we have a large insurance policy and because I'm having an affair, motive, motive, whatever, okay. Ahh, because you guys saw a red truck, or somebody saw a red truck or whatever and I used to have a red truck, I'm the asshole. I'm the bad guy, okay. I was out there that night. People have seen me, so I was there, or close to it. Right? So from Shaun's standpoint, I'm the one, oh, my God, I'm dead. Okay?"
>
>      Do you remember making that statement?
>
> A:      I sure do.

Tr. Trans. Vol. IX at 1829-30. Stemple then went on to explain why he made some of those statements during the interview. He now complains that the questions "illustrate the prosecutor's unconstitutional and exploitation of Stemple's exercise of his constitutional rights." See Dkt. # 21 at 271. Stemple also objects to the following references to the videotape made by the prosecutor during closing argument:

You look at his statements, the statements of this defendant, . . . to Fred Parke, to the police, to the written statement he made. Look at those statements. They're all inconsistent. Don't you think that you would remember what you were doing at the particular time your wife is killed?

Human nature, ladies and gentlemen. He was trying to hide something. He was making it up as he went along. That was one thing in his plan he didn't think about, the details. He didn't have answers for those questions. You look at the statement that he made to Fred Parke and it's on this tape right here. You watch this tape. It's interesting about these tapes -- put that right up here because that's a piece of evidence you saw. What's interesting about a tape is there's no credibility problem. There's no memory problem. There's no bias. There's no bias.

You can watch that tape, and if you watch the tape, if you take that statement alone discard everything else, what's he say? "We have a large insurance policy and because I was having an affair. Because I was having an affair. Motive, motive. Whatever, okay." That's what he says. That was his motive. "Because you guys saw a red truck or somebody saw a red truck." How does he know that? "I was out there that night." He says that to Fred Parke on that tape. "I'm the one, oh my god, I'm dead." He admits it all to you on tape. Discard everything else. That's enough to convict him.

Tr. Trans. Vol. X at 1992-94.

Stemple asserts that it was improper for the prosecutor to comment on his videotaped statements because he had invoked his right to counsel. For the reasons set forth above, this Court has determined that the testimony Stemple gave during the videotaped interview was admissible. The prosecutor could, therefore, fairly comment on this evidence in closing argument. See United States v. Nelson, 450 F.3d 1201, 1213 (10th Cir. 2006) (citing United States v. Espinosa, 771 F.2d 1382 (10th Cir. 1985)). As in Nelson and Espinosa, the prosecutor construed Stemple's words as an admission of his guilt. Thus, the prosecutor's comments on the evidence were proper. Id. Because the prosecutor's comments were proper, Stemple's trial counsel was not constitutionally ineffective for failing to object to the comments.

Having failed to demonstrate that the OCCA's decision was an unreasonable application of

established Supreme Court law or an unreasonable determination of the facts in light of the evidence, Stemple is not entitled to relief on his second ground for habeas relief. 28 U.S.C. § 2254(d)(1)(2).

### III.   Admission of jailhouse confession documents and testimony of jailhouse informants

In his third ground for relief, Stemple claims that the admission into evidence of his written confession resulted in a fundamentally unfair trial. He asserts that he was under duress from other inmates in the Tulsa County Jail when the confession was forced from him. See Dkt. # 21 at 278. Stemple also argues that the "testimony of the three jailhouse snitches is so patently absurd that it was error for the trial court to admit such evidence in the first place." Id. at 282. Respondent contends that this issue is unexhausted because it was not presented to the state courts for consideration. See Dkt. # 33 at 65. Stemple acknowledges in his reply that "this appears to be the case." See Dkt. # 36 at 21. Citing paragraph 51 of his direct appeal opinion, however, Stemple asserts that the OCCA addressed the facts surrounding the voluntariness of his jailhouse confession even though he did not raise it on direct appeal. Id.  Contrary to Stemple's contention, paragraph 51 of the OCCA's direct appeal opinion addresses Stemple's Proposition XI in which he claimed the "jailhouse papers" introduced at trial were subject to the protection of the attorney-client privilege and the work product doctrine. No mention is made in the opinion or in Stemple's direct appeal brief of coercion, force, or duress from other inmates. He argued simply that the jailhouse writings should not have been admitted into evidence because they were meant to be read only by his attorney. See Brief of Appellant filed in OCCA Case No. F-98-201.

As a general rule, petitioners must exhaust available state court remedies before seeking redress via a federal habeas corpus petition. See 28 U.S.C. § 2254(b)(1); Smallwood v. Gibson, 191

F.3d 1257, 1267 (10th Cir. 1999). Stemple did not raise his ground three issue in state court, and has, therefore failed to exhaust his state court remedies on that issue. Nevertheless, this Court may choose to deny relief on the merits pursuant to 28 U.S.C. § 2254(b)(2) rather than dismiss the petition or hold it in abeyance while Stemple returns to state court to exhaust his ground three claim. See Rose v. Lundy, 455 U.S. 509, 510 (1982) (instructing a district court to dismiss without prejudice and allow the petitioner to refile once the claims are exhausted); Rhines v. Weber, 544 U.S. 269, 277 (2005) (if AEDPA's one-year filing requirement would be in jeopardy and there is good cause for petitioner's failure to exhaust, the court can decline to dismiss the matter, but issue a stay and abeyance of the petition while petitioner exhausts his state court remedies). The theory behind addressing the merits is that even if a petitioner fails to exhaust an issue it might not be worth his time to exhaust in state court and then re-file the habeas petition if the claim is patently without merit. See Moore v. Schoeman, 288 F.3d 1231, 1235 (10th Cir. 2005).  In this case, the Court finds that Stemple's unexhausted third ground for relief should be denied on the merits.

Stemple claims that the written confession entered into evidence as State's exhibit 88 was "bogus" and was not the product of his voluntary act. See Dkt. # 21 at 283. Citing Culombe v. Connecticut, 367 U.S. 568 (1961), Stemple contends that the confession should not have been entered into evidence because it was not the product of his own free choice. See Dkt. # 21 at 283. He argues that the "three jailhouse snitches" who testified about his various incriminating oral statements and written materials were not credible. Id. at 280. He then explains, as he testified at trial, that these three witnesses extorted money from him using threats of physical violence "in hopes of gaining money and benefit" in their own pending criminal cases. He further explains, as he did at trial, that witness Macon extorted the written "confession" from Stemple by threatening his family

members. Id. at 281.

Addressing the voluntariness of a confession made during a police interrogation, the Supreme Court in Culombe held that a confession was involuntary where officers held the defendant and subjected him to five days of continuous questioning. Culombe, 367 U.S. at 626. Although the Culombe Court reviewed misconduct on the part of the police in obtaining a confession, the following language found in the Court's opinion is instructive here:

> Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford.

Culombe, 367 U.S. at 603. In considering a different issue related to the admissibility of a jailhouse informant's testimony, the Supreme Court recently noted that our legal system "is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses." See Kansas v. Ventris, 129 S.Ct. 1841, 1847 at n.* (2009).

During Stemple's trial, in response to a defense objection concerning the testimony and evidence presented through the three jailhouse informants, the trial judge conducted an in-camera hearing to determine the admissibility of the informants' testimony. See Tr. Trans. Vol. VII at 1252-76.  In that hearing, Rahmon Macon, William Campion, and Herbert James Johnson each explained the circumstances surrounding their communications with Stemple at the Tulsa County Jail. After hearing testimony and argument from both sides, the trial court ruled the testimony and evidence presented by Macon, Campion and Johnson was admissible, and its weight and credibility were for the jury's determination. Id. at 1276.  In addition, the judge instructed the jury as follows:

> Instruction No. 18:  Evidence has been introduced in this case that the defendant made a statement to Rahmon Macon at the Tulsa County jail in November of 1996.

> Evidence relating to an alleged statement by a defendant outside of court and after a crime has been committed may be considered by you, but only with great caution and only if you determine that it was made and it was made voluntarily. Unless you are convinced beyond a reasonable doubt that the statement was voluntary, you should disregard it entirely.
>
> To determine whether the defendant's statement was voluntary, you should consider all the circumstances surrounding it, including the age, education level, physical and mental condition of the defendant as shown by other evidence in this case. A statement is voluntary when made by a person exercising his or her free will. A statement made against a person's will in response to force, threat, or promise is not voluntary.
>
> If after considering the evidence you determine that the statement was made by the defendant and was voluntary, you may give it whatever weight you feel it deserves.

O.R. Vol. II at 233. Identical instructions regarding the testimony of Herbert James Johnson and William Campion were given to the jury. Id. at 234-35. Furthermore, defense counsel thoroughly and extensively cross-examined witnesses Macon, Johnson, and Campion, attacking their credibility and exposing any motive they may have had to fabricate their testimony. See Tr. Trans. Vol. VII at 1300-24, 1327-28, 1343-48, 1427-54.

Stemple's efforts to discredit the testimony of Macon, Johnson and Campion, while trying to persuade this Court that his own trial testimony presented the true version of events do not support a constitutional claim that his trial was fundamentally unfair. Stemple has not convinced the Court that introduction of the written confession obtained from him while in jail resulted in a fundamentally unfair trial. Nor has he demonstrated a violation of his constitutional rights. The jury, as the trier of fact, made its own conclusion about the credibility of witnesses and about Stemple's involvement in the murder of his wife. This Court will not disturb that conclusion based upon the arguments presented by Stemple in his third ground for habeas relief.

## CONCLUSION

35

After a complete review of the transcripts, trial record, appellate record, briefs filed by the Petitioner and Respondent, and the applicable law, the Court finds Stemple's request for relief in his petition for writ of habeas corpus by a person in state custody pursuant to 28 U.S.C. § 2254 (Dkt. # 21) to be without merit. Accordingly, habeas relief on all grounds is denied.

**ACCORDINGLY IT IS HEREBY ORDERED THAT**:

1.   Randall G. Workman is substituted for Gary Gibson as the party Respondent and the **Court Clerk is directed** to note such substitution on the record.

2.   Petitioner's request for habeas relief (Dkt. # 21) is **denied**.

Dated this 2nd day of June, 2009.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

36